**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

        Plaintiff,

vs.                                                                    No. 24-CR-0032 MV

FRANCISCO DIAZ,

        Defendant.

**MEMORANDUM OPINION AND ORDER**

THIS MATTER is before the Court on Mr. Diaz's Motion to Suppress Statements and Evidence for Violations of the Fourth and Fifth Amendments to the U.S. Constitution. Doc. 6. The government filed a Response [Doc. 14] and the defense filed a Reply [Doc. 16]. The Court held a suppression hearing on January 12, 2024. Having considered the briefs, testimony, and relevant law, and being otherwise fully informed, the Court finds that the Motion is not well-taken and will be denied.

**BACKGROUND**

On June 17, 2019, July 2, 2019, July 29, 2019, and August 26, 2019, Drug Enforcement Administration (DEA) Agent Jason Jones, along with agents from the Region III Narcotics Task Force conducted controlled purchases of cocaine from Francisco Diaz using a confidential source. Hearing Transcript Part II ("H'rg. Tr. II") at 2:22–24.[1]  At the hearing, Agent Jones testified that the confidential source was an informant for the Region III Task Force and that he had not worked with the source before. *Id.* at 2:18–21. Agent Jones further testified that the confidential informant

---

[1] Two different court reporters transcribed the hearing, thus there are two transcripts, one from the morning session and one from the afternoon session. The Court's citations to the transcript refer to the court reporter's original, unedited version; any final transcripts may contain slightly different page and/or line numbers.

was familiar with Mr. Diaz and had been communicating with Mr. Diaz via text to arrange the controlled purchases. Hearing Transcript Part I ("H'rg Tr. I") at 57:16–17. Specifically, Agent Jones testified that he had seen text messages between the confidential source and a phone number belonging to Mr. Diaz, which Agent Jones also recognized on the Verizon phone records provided by the defense. Hr'g Tr. II at 5:10–12. For each purchase, the confidential source arranged to purchase the cocaine from Mr. Diaz at Mr. Diaz's home, 7 Josephine Road in Santa Fe, New Mexico. *Id.* The purchases were conducted according to the following protocol.

Prior to the purchase, Agent Jones, along with Region III agents, would meet with the confidential source and provide them with cash funds and a recording device. H'rg Tr. I at 58:1–3, 62:25–63:1, 64:17, 66:9. Agent Jones and the Region III agents would then follow the confidential source to Josephine Road but would keep a distance from Mr. Diaz's property in order to avoid detection. *Id.* at 61:17–21. After the source left Mr. Diaz's home, the agents would follow the source to a predetermined location. *Id.* at 62:5–6. The confidential source would then turn over the purchased cocaine and the recording device and the agents would search the source and the source's car for any other contraband. *Id.* at 62:7–10. At each controlled purchase, agents found no additional contraband on the source or in the source's car. *Id.* at 60:21–61:1, 62:7–10, 65:17–19, 67:17–19. For the purchases that occurred on July 29, 2019 and August 26, 2019, agents placed a tracking device on the source's car to track the car's location and confirm that the car entered Mr. Diaz's property. *Id.* at 64:19–25, 66:11–12. Agent Jones also testified that he listened to the recordings from the controlled purchases and in at least one of the recordings, he heard the confidential source purchasing the drugs from Mr. Diaz. Hr'g Tr. II at 4:4. On cross-examination, the defense elicited testimony from Agent Jones that he had never heard Mr. Diaz's voice prior to listening to the recording. Hr'g Tr. II at 4:7–9. However, the government proffered that "it was not

a woman talking to the CS." Hr'g Tr. II at 169:22.

On August 29, 2019, Agent Jones applied for a search warrant for Mr. Diaz's home at 7 Josephine Road and submitted an affidavit describing the controlled purchases. *See* Application for Search Warrant. Magistrate Judge Steven C. Yarborough found probable cause and granted the application. *Id.* On the morning of September 3, 2019, prior to the execution of the search warrant, Agent Jones led a briefing near a Santa Fe Rail Runner station with Region III Task Force agents, State Police officers, and officers with the Santa Fe County Sherriff's Office. Hr'g Tr. I at 68:13–14. Deputy Kurt Whyte of the Santa Fe County Sherriff's Office was present at the briefing. *Id.* The exact timeline of the following events is unclear, as DEA Agents Jones and Kirk Lemmon could not recall many of the details from that day and it appears that there were several different communication lines between agencies.[2] At some point after the briefing, a surveillance team of Region III Task Force agents parked outside Mr. Diaz's home. Hr'g Tr. II at 43:10–20. At around 5:45 a.m., the surveillance team saw a silver/gray Lexus leave the property. Doc. 14 at 2. Mr. Diaz testified that he was driving the car and that he was driving his 12-year-old daughter to school for basketball practice. H'rg Tr. II at 107:21–22.  Although the government's brief states that, at the time, the surveillance team did not know who was in the vehicle, Doc. 14 at 2, the government clarified at the hearing that this was a factual misstatement. Hr'g Tr. II at 44:23–24. Agent Jones testified that the surveillance team notified him that a car was leaving the property but was unable to recall whether the surveillance team communicated that Mr. Diaz was in the car. *Id.* at 41:7–13.

---

[2] Although the defense's motion will ultimately be denied, the Court is troubled by the government's witnesses' inability to clarify key factual issues, especially where, as here, the government carries certain evidentiary burdens. Even though the facts, viewed in the light most favorable to Mr. Diaz, ultimately require that the motion be denied, the Court reminds the government of its obligation to prepare its witnesses and present evidence sufficiently for the Court to make clear factual and legal determinations.

He added, "If I was told it was Mr. Diaz [in the car], I would have asked them to stop the vehicle." *Id.* at 38:15–17. Agent Jones did in fact order that an officer in a marked police vehicle stop the Lexus. H'rg Tr. I at 69:10; Hr'g Tr. II at 10:1–2.

After Deputy Whyte left the briefing, but before he could get to 7 Josephine Road, he was informed by agents that Mr. Diaz was seen leaving his home in a gray Lexus and was asked to stop the car. Hr'g Tr. I at 12:11–14. It is unclear from any of the testimony whether Deputy Whyte was informed that Mr. Diaz was the driver directly by the surveillance team or whether he was given this information by the DEA agents who were at the briefing. Agent Jones testified that Deputy Whyte was asked to conduct the stop "because we thought it was safer for a patrol unit, a marked unit with the lights and sirens, to make the traffic stop." H'rg Tr. II at 10:1–4. Deputy Whyte pulled the Lexus over at approximately 6:02 a.m. Government's Exhibit 2 ("Exh. 2") at 0:33. He was accompanied by three Region III Task Force agents. Hr'g Tr. I at 27:23–24. Video from Deputy Whyte's lapel camera shows that the three Task Force agents were armed and wearing black ski masks and bulletproof vests. Government's Exhibit 3 ("Exh. 3"). Deputy Whyte testified that this was not classified as a "high-risk" stop and that no weapons were drawn at any point. H'rg Tr. I at 16:13–19.

Once the Lexus was pulled over, one of the agents approached the car, opened the driver's side door of Mr. Diaz's car and stated, "I need to ask you to step out of your vehicle please." Exh. 3 at 00:15. When Mr. Diaz asked, "Why? What did I do?," the agent responded, "Well, we'll explain" and again asked him to step out of the car. *Id.* at 00:32. Although the audio is not very clear, it appears that one of the officers explained that there was a warrant for Mr. Diaz's house and stated that he would need to go back to the house with them. *Id.* at 00:52–1:00. Deputy Whyte testified that the agents informed Mr. Diaz that "he had the option to ride with me back to his house

4

while a search warrant was conducted." Hr'g Tr. I at 17:3–5. Mr. Diaz asked if he could drop his daughter off at school and the agent responded, "Why don't you let one of us do that, you can go back with this deputy right here." Exh. 3 at 1:10–1:13. Mr. Diaz then indicated where his daughter's school was located and shook hands with one of the agents. *Id.* at 1:20–1:25. At the hearing, Deputy Whyte testified that at no point did Mr. Diaz argue with the agents or object to them taking his daughter to school. Hr'g Tr. I at 17:15–21. Two of the agents then patted Mr. Diaz down for weapons. *Id.* at 1:35. While Mr. Diaz was patted down, the third agent went to the driver's side of the car and spoke with Mr. Diaz's daughter. *Id.* Mr. Diaz testified at the hearing that he did not give the agent permission to speak with his daughter. Hr'g Tr. II at 119:18–20. Mr. Diaz was then asked to hand over his wallet and phone. Exh. 3 at 1:22. One of the agents stated that Mr. Diaz was not under arrest at this time. *Id.* at 1:59. Mr. Diaz then turned to look at the agent speaking with his daughter for a few seconds until the agents pointed him towards Deputy Whytes's car and Deputy Whyte stated, "Come on back here." *Id.* at 2:00–2:04. Deputy Whyte walked Mr. Diaz over to the backseat on the passenger side of Deputy Whyte's car and helped him put on his seatbelt. *Id.* at 2:07–2:27.

Once Mr. Diaz was in the back of the police car, video footage from inside the car shows him cursing to himself, saying "f***". Government's Exhibit 4 ("Exh. 4") at 3:55. As Deputy Whyte started driving to Mr. Diaz's home, Mr. Diaz asked if he could call his wife because "I got my babies. I got to get them to school, all kinds of s***." Exh. 4. At 4:24–4:31; Doc. 157 at 3.[3] Deputy Whyte responded, "Say what?" and Mr. Diaz asked again if he could call his wife because he had to get his children to school. *Id.* at 4:31–4:40. Deputy Whyte answered, "We'll see when

---

[3] Although the video exhibits show Mr. Diaz referring to his "wife," he was not in fact married at the time. At the hearing, it was clarified that Mr. Diaz has a fiancée, Michelle Romero, and an ex-wife, Elora Romero. H'rg Tr. II at 156:8–17.

we get to the house." *Id.* When asked at the hearing why he did not give Mr. Diaz a phone to call his wife, Deputy Whyte stated that he did not have a work phone and that he generally does not give out his personal phone to suspects or defendants for safety reasons. H'rg Tr. I at 54:11–19.

Agents breached the home at around 6:06 a.m., prior to Mr. Diaz's arrival, by breaking down the exterior wall to get through the pedestrian gate. DEA Report at 2. The agents then broke down the front windows and front door of the house. H'rg Tr. II at 11:1–6. Agent Jones testified that these measures were taken because agents were informed that Mr. Diaz could have been associated with dangerous drug traffickers. *Id.* at 48:7–18. On cross-examination, Agent Jones admitted that he was aware that there potentially would be children in the home. *Id.* at 8:1–3.

As Deputy Whyte turned onto a street near Mr. Diaz's house, Mr. Diaz stated, "You guys have my kids scared over there, they're all babies too." Exh. 4 at 13:32. He then asked if he could go see the children "real quick," to which Deputy Whyte responded that it would be "up to the agents." *Id.* at 13:38–13:40. Footage from Deputy Whyte's dash camera shows that as Deputy Whyte and Mr. Diaz drove up to the house, several cars were parked on the street, more than 10 law enforcement officers were walking in and out of the house, and the exterior wall of Mr. Diaz's property had a large gap in the middle, as if it had been run into or broken. Exh. 2 at 13:30–14:10. When Mr. Diaz saw that the wall outside of his house was broken, he stated, "They f****** broke my f****** wall are you serious, f****** piece of s****, you f****** bunch of piece of s****." *Id.* at 14:02–14:27.

Deputy Whyte parked the car outside of Mr. Diaz's home at approximately 6:16 a.m. Exh. 2 at 14:16. After Deputy Whyte exited the car, leaving Mr. Diaz in the back seat, Mr. Diaz hit the door from the inside and called him a "p*ssy." *Id.* Mr. Diaz then banged on the inside of the window and stated, "Come here b****." *Id.* at 14:56–15:04. He again knocked on the window of

the police car to get one of the officer's attention and stated, "I want to make sure my kids are ok, bro . . . I want to make sure my kids are ok. I have my little two-year-old in there. Come on man, help me out." *Id.* at 15:15. The officer can be heard saying "ok." *Id.* Mr. Diaz then stated, "All I care about is my kids right now bro, they're probably scared s***less in there with these f**** with guns." *Id.* at 15:28. The officer responds, but the audio is not clear. *Id.* The government stated in its brief that "the officer's response is inaudible, but it likely amounted to a request to wait for the DEA agents at the scene." Doc. 157 at 4. About two minutes later, Mr. Diaz yelled out, "Hey, are my kids ok? Where are my kids at? My babies? Hey man, I want to see my kids." *Id.* at 18:08.

Deputy Whyte testified that he notified other agents on the scene that Mr. Diaz was concerned for his children. H'rg Tr. I at 44:15–19; Defense Exhibit C ("Exh. C.") at 11:44. After Mr. Diaz had been sitting in the car for about five minutes, DEA agents Lemmon, Jones, and Kevin Mondragon approached the car and Deputy Whyte opened the door. Exh. 2 at 19:11. When the door was opened, Mr. Diaz asked, "Can I get out?" and Agent Lemmon responded, "I'm not going to have any problems with you, am I?" *Id.* at 19:14. Mr. Diaz stated, "No, I just want to see my kids." *Id.* Once Mr. Diaz was out of the car, Agent Lemmon explained that he was with the DEA and that Mr. Diaz probably knew why the agency was at his house. Exh. 5 at 00:00 – 1:01. Agent Lemmon gestured to Agent Jones, describing him as "the guy in charge" and noting that "your fate pretty much rests with him." *Id.* Agent Lemmon then added, "I'm going to take you inside so you can see your kids, make sure you can calm them down. I'm going to treat you respectfully, he's going to treat you respectfully, I just ask the same thing of you. Is that fair?" *Id.* Mr. Diaz responded, "That's fair." *Id.* Agents then patted Mr. Diaz down for weapons and four agents escorted him to the house. *Id.* In the video, Mr. Diaz is not handcuffed and pats one of the agents on the shoulder as they walk towards the house. *Id.*

At this point, the witnesses' recollections begin to diverge. Mr. Diaz testified that upon walking up to the home, he saw that the windows were broken and feared that his children may have been sitting on the couch beneath the windows when agents broke them down. H'rg Tr. II at 137:5–10.  He further testified that when he entered his home, he saw his three daughters, ages two, four, and seven, "curled up" together on the couch looking scared. *Id.* at 137:16–21. Mr. Diaz recalled that his 14-year-old son was handcuffed and lying on the couch on his side. *Id.* Upon seeing this, Mr. Diaz stated that he immediately got "aggressive" and demanded that the agents remove the handcuffs, which they did. *Id.* Mr. Diaz's son testified that agents handcuffed him when they first breached the home and that he sat in the living room with handcuffs for about 30 to 45 minutes. *Id.* at 78:5–79:17. However, a report prepared by Agent Jones indicates that agents first breached the home at around 6:06 a.m., DEA Report at 2, and Mr. Diaz was walked to the home at approximately 6:21 a.m., Exh. 5, thus Mr. Diaz son's account of the timeline does not appear to be accurate. Both Agent Jones and Agent Lemmon denied ever seeing Mr. Diaz's son in handcuffs. *Id.* at 12:13, 51:7. Mr. Diaz, Agent Jones, and Agent Lemmon all testified that Mr. Diaz did talk to and comfort his children when he entered the home. *Id.* at 138:12–13. Mr. Diaz testified that Agent Jones instructed him to settle the children down, so Mr. Diaz turned on the television and put on the Lion King movie for the children. *Id.* at 138:22–139:3. He also testified that he then asked again if he could call his wife and that Agent Jones responded, "Let's have a talk first." *Id.* at 138:22–25. On the other hand, Agent Jones testified that law enforcement had turned on the television for the children and that someone from law enforcement had called the children's mothers. H'rg Tr. I at 70:8–13.

It is undisputed that after Mr. Diaz spoke to his children, he went to the master bedroom with Agents Jones, Lemmon, and Mondragon, and the door to the room was closed. H'rg Tr. II at

72:17–19. However, while both Agent Jones and Agent Lemmon testified that Mr. Diaz was asked to step into the master bedroom to talk, H'rg Tr. II at 68:2, 72:17, Mr. Diaz testified that he was "pulled" into the master bedroom. *Id.* at 140:7. Once in the bedroom, Agent Jones testified that he read Mr. Diaz his *Miranda* rights at approximately 6:26 a.m. and that Mr. Diaz agreed to answer questions. H'rg Tr. I at 73:16-22. Agent Jones further testified that while in the master bedroom, Mr. Diaz was not crying, did not appear distressed, and clearly spoke and understood English. *Id.* at 73:16–75:3. Mr. Diaz testified that while he was questioned, Agent Jones had Mr. Diaz's phone and was scrolling through it. H'rg Tr. II at 141:21–23. Agent Jones did not recall whether he had Mr. Diaz's phone during the questioning. *Id.* at 20:10–12. Mr. Diaz testified that after he told Agent Jones what he "wanted to hear," Agent Jones gave him his phone back and allowed him to call the children's mothers. *Id.* at 142:5. Mr. Diaz's phone records show that he called his fiancée, Michelle Romero, twice at 6:36 a.m. and 6:41 a.m., and that he called his ex-wife, Elora Romero, at 6:37 a.m. Defense Exhibit E–1 ("Exh. E–1"). Mr. Diaz's son testified that his mother, Elora, had arrived by around 7:06 a.m., and that she left with his sister shortly afterwards, with him following in his own car. H'rg Tr. II at 88:1–8. It is unclear when Michelle Romero arrived at the home, but she testified that at some point she came and picked up her two daughters. *Id.* at 99:23–100:7. Mr. Diaz remained in the master bedroom until at least 7:14 a.m. Government's Exhibit 7 ("Exh. 7").

Agent Jones's report notes that, after the execution of the warrant, Mr. Diaz admitted that the cocaine found inside the closet belonged to him and gave details about his cocaine sales, dilution methods, and profits. DEA Report at 3. He refused to answer questions about his supplier. *Id.* Agents completed their search of the house around 12:30 p.m. and Mr. Diaz was arrested following the search. DEA Report at 4.

# DISCUSSION

## I. Mr. Diaz's Statements Were Voluntary, and Suppression Is Not Warranted.

The defense first argues that Mr. Diaz's statements to DEA agents were involuntary and must be suppressed. Doc. 6 at 5–9. The government argues that the agents did not engage in coercive conduct and that Mr. Diaz voluntarily waived his *Miranda* rights and answered questions. Doc. 16 at 5. For the following reasons, the Court finds that Mr. Diaz's statements were voluntary, and that suppression is not warranted under this argument.

### A. Relevant Law

"When the government obtains incriminating statements through acts, threats, or promises which cause the defendant's will to be overborne, it violates the defendant's Fifth Amendment rights and the statements are inadmissible at trial as evidence of guilt." *United States v. Toles*, 297 F.3d 959, 965 (10th Cir. 2002). "To be admiss[i]ble, a confession must be made freely and voluntarily; it must not be extracted by threats in violation of due process or obtained by compulsion or inducement of any sort." *Griffin v. Strong*, 983 F.2d 1540, 1542 (10th Cir. 1993). The central question is whether the confession is "the product of an essentially free and unconstrained choice by its maker." *United States v. Perdue*, 8 F.3d 1455, 1466 (10th Cir. 1993). If not, "if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process." *Id.*

Ultimately, "[t]he Government bears the burden of showing, by a preponderance of the evidence, that a confession is voluntary." *United States v. Lopez*, 437 F.3d 1059, 1063 (10th Cir. 2006). The Tenth Circuit "determines the voluntariness of a confession based upon the totality of the circumstances, considering 'both the characteristics of the accused and the details of the interrogation.'" *Toles*, 297 F.3d at 965-66. This test "does not favor any one of these factors over

the others—it is a case-specific inquiry where the importance of any given factor can vary in each situation." *Sharp v. Rohling*, 793 F.3d 1216, 1233 (10th Cir. 2015).  However, "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary.'" *Colorado v. Connelly*, 479 U.S. 157, 167 (1986).  Additionally, "as interrogators have turned to more subtle forms of psychological persuasion, courts have found the mental condition of the defendant a more significant factor in the 'voluntariness' calculus."  *Id.* at 164.  Other relevant factors "include (1) the age, intelligence, and education of the defendant; (2) the length of detention; (3) the length and nature of the questioning; (4) whether the defendant was advised of his constitutional rights; . . . (5) whether the defendant was subject to physical punishment[;]" and (6) "the location of the interrogation." *Lopez*, 437 F.3d at 1063-64 (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)); *Perdue*, 8 F.3d at 1466.

### B. DEA Agents and State Law Enforcement Officers Did Not Engage in Coercive Conduct.

Before determining voluntariness, courts must first address whether there was coercive police activity before considering the characteristics of the accused.  *See Connelly*, 479 U.S. at 167 ("coercive police activity is a necessary predicate" to any finding of voluntariness). Courts can look to the nature of the questioning, and whether the defendant was advised of his *Miranda* rights or was subject to physical punishment in order to determine whether police engaged in coercive conduct. *See Lopez*, 437 F.3d at 1063-64.  The defense does not allege any instance of physical punishment but rather focuses on the psychological pressures that Mr. Diaz experienced. Doc. 6. Ultimately, although the agents' conduct on September 3, 2019 certainly caused distress to Mr. Diaz and his children, the agents did not engage in coercive conduct and thus Mr. Diaz's claim fails at the first step of the inquiry.

First, where a defendant is advised of his *Miranda* rights, this tends to mitigate coercive conduct. *Lopez,* 437 F.3d at 1065. Here, the defense does not appear to contest that the agents advised Mr. Diaz of his *Miranda* rights but argues only that while in the master bedroom, "Mr. Diaz's only focus was getting his children away from the home and ensuring their wellbeing." Doc. 6 at 7. Agent Jones testified that he read Mr. Diaz his rights and that Mr. Diaz verbally acknowledged his rights. H'rg Tr. I at 73:16-22. He further testified that while in the master bedroom, Mr. Diaz was not crying, did not appear distressed, and clearly spoke and understood English. *Id.* at 73:16–75:3. Because the defense is not contesting that Mr. Diaz was advised of his rights, this factor weighs against finding that the agents' conduct was coercive. *Lopez,* 437 F.3d at 1065.

Looking to the nature of the questioning, the defense alleges that agents acted coercively by "preying upon [Mr. Diaz's] vulnerability as it relates to the wellbeing of his children." Doc. 6 at 8. To support its argument, the defense relies primarily on the opinions in *United States v. McCullah,* 76 F.3d 1087 (10th Cir. 1996), *Lynumn v. Illinois,* 372 U.S. 528 (1963), and *United States v. Tingle,* 658 F.3d 1332 (9th Cir. 1981). However, these cases are readily distinguishable from the facts in Mr. Diaz's case. First, the Tenth Circuit in *McCullah* found that the defendant's statements were coerced because an FBI informant told the defendant that the informant was a member of a criminal organization that was going to kill the defendant and that the informant could protect the defendant if the defendant confessed. 76 F.3d at 1100. Further, the Supreme Court in *Lynumn* found that police engaged in coercive conduct where they told the defendant that state financial aid for her infant children would be cut off and her children would be taken away if she did not cooperate. 372 U.S. at 534. In *Tingle,* the Ninth Circuit found that the interrogating officer acted coercively because he intended to "cause Tingle to fear that, if she failed to cooperate, she

would not see her young child for a long time." 658 F.2d at 1336. Taken together, these cases show that police engage in coercive conduct when they make implicit or explicit threats to the defendant or family members in order to secure cooperation. *See also Arizona v. Fulminante,* 499 U.S. 279, 287 (1991) (finding that a confession was coerced where an FBI agent suggested that the defendant would be subject to violence from other inmates); *see also McCullah,* 76 F.3d at 1101 (finding that the defendant's confession was coerced where an informant fabricated a threat against the defendant's life); *United States v. Salazar,* No. CR 18-3500 JB, 2020 WL 520941 (D.N.M. Jan. 31, 2020) (agents engaged in coercive activity by stating that the defendant's children's lives were in danger).

In contrast to the above cases, the defense does not allege that any of the officers threatened to physically harm or kill Mr. Diaz or his children, either explicitly or implicitly. Deputy Whyte, Agent Jones, and Agent Lemmon all denied making any threats to the personal safety of Mr. Diaz or his children and none of the video exhibits depict any law enforcement officer making such threats. Admittedly, the traffic stop and the execution of the search warrant were extremely frightening for Mr. Diaz's children. Mr. Diaz's twelve-year-old daughter undoubtedly would have felt fear and anxiety when police officers got in her father's car and drove her to school. Mr. Diaz's other children were likely confused and terrified as agents broke down the front door and windows and the house was surrounded by armed police officers. *See* Defense Exhibits F, G. Mr. Diaz testified in great detail about his concerns over his children, including that he feared that one of the officers who drove his daughter to school might rape or otherwise harm her. H'rg Tr. II at 162:13–18.  It is even arguable that the agents needlessly broke down the exterior wall as well as the front windows and door, especially since they knew there could be children in the home. Nevertheless, Mr. Diaz admitted that no law enforcement agent threatened to harm his children or

13

take away his children in order to secure his cooperation. *Id.* at 162:18. In fact, when Mr. Diaz first got out of the police car, Agent Lemmon told him, "I'm going to take you inside so you can see your kids, make sure you can calm them down. I'm going to treat you respectfully, he's going to treat you respectfully, I just ask the same thing of you. Is that fair?" Exh. 5 at 00:00–1:01. Mr. Diaz agreed that this was fair. *Id.* Admittedly, after the hearing, questions remain as to whether Mr. Diaz's son was handcuffed, whether law enforcement made any effort to call the children's mothers, and whether it was Mr. Diaz or law enforcement officers who turned the television on for the children. Ultimately, however, these factual disputes are not dispositive, as even if the Court accepted Mr. Diaz's version of the facts, none of these circumstances rise to the level of coercive conduct contemplated in *McCullah, Lynumn,* or *Tingle,* where there was a clear *quid pro quo* exchange of a confession for the safety of the defendant or the defendant's family members.

Apparently recognizing this distinction, the defense argues that coercive conduct need not consist of only express threats in exchange for cooperation. Doc. 16 at 4. Instead, the defense argues that Agents Jones and Lemmon, who were present in the master bedroom and conducted the questioning, knew that Mr. Diaz was concerned for his children and took advantage of this fact to extract a confession by refusing to allow Mr. Diaz to call the mothers of his children. Hr'g Tr. II at 173:4–8. To support its argument, the defense relies on the following quote from *Malloy v. Hogan*: "[W]e have held inadmissible even a confession secured by so mild a whip as the refusal, *under certain circumstances*, to allow a suspect to call his wife until he confessed." 378 U.S. 1, 7 (1963) (citing *Haynes v. Washington,* 373 U.S. 503 (1963)) (emphasis added). However, the facts in the instant case bear little resemblance to the particular circumstances under which the Supreme Court found that police acted coercively by preventing a defendant from calling his wife. In *Haynes,* the defendant was arrested and held in a police station for 16 hours until he signed a

written confession. 373 U.S. at 504. The defendant testified that on the night he was arrested, he made several requests to call his wife and a lawyer, and that the interrogating detective told him repeatedly that he could make a phone call only after he cooperated and made a statement. *Id.* at 507. The defendant was continuously detained and was not taken before a magistrate "until he had acceded to demands that he give and sign the written statement." *Id.* at 510. Even after a preliminary hearing, the defendant was not allowed to make a phone call until "some five or seven days after his arrest." *Id.* at 504. Thus, the *Haynes* Court found that "the petitioner was alone in the hands of the police, with no one to advise or aid him, and he had no reason not to believe that the police had ample power to carry out their threats to continue, for a much longer period if need be, the incommunicado detention." *Id.* at 514 (internal quotations omitted).

In the instant case, Mr. Diaz was informed at the outset of the traffic stop that he was not under arrest. Government's Exh. 3 at 1:22–1:59. He was not held incommunicado for a lengthy period of time, but instead was allowed to speak to his children and put a movie on for them before proceeding up to the master bedroom to answer questions. Even if the Court accepts Mr. Diaz's testimony that Agent Jones told him he could call the children's mothers after answering a few questions, the phone call was withheld for approximately ten minutes, rather than for several days, as in *Haynes.* Further, unlike in *Haynes,* there is no allegation that Agent Jones specifically communicated to Mr. Diaz that he could only make a phone call if he cooperated and gave a statement. It is also notable that the phone call in *Haynes* was the only thing that could ensure the defendant had a way to potentially make bail and communicate with a lawyer. Here, although perhaps the agents could have been more proactive in getting the children out of the house, the children were not in imminent danger and Mr. Diaz's liberty was not threatened by his inability to call the mothers of his children.

Case 1:24-cr-00032-MV    Document 62    Filed 01/31/24    Page 16 of 24

In sum, there is no doubt that the events surrounding the execution of the warrant were distressing to Mr. Diaz and his family. However, a confession cannot be rendered involuntary by "a defendant's mental condition, by itself and apart from its relation to official coercion." *Connelly,* 479 U.S. at 164. The Court finds that the DEA agents and other state law enforcement officers who interacted with Mr. Diaz on September 3, 2019 did not engage in coercive conduct. Because coercive conduct is a "necessary predicate" to the voluntariness analysis, the Court's inquiry stops here, and the Court need not reach the issue of whether Mr. Diaz's statements were voluntary under the totality of the circumstances. *Id.* at 167.

**II. Mr. Diaz Was Seized, but Agents Had Probable Cause to Detain Him.**

In the alternative, the defense argues that Mr. Diaz was illegally seized and that all resulting evidence, including his statements, must be excluded. Doc. 6 at 13. The government argues that Mr. Diaz was not seized, noting that he voluntarily returned to his home with officers. For the following reasons, the Court finds that Mr. Diaz was seized, but that agents had probable cause to arrest and therefore detain him. Accordingly, suppression is not warranted under this argument.

**A. Relevant Law**

The Fourth Amendment protects "the right of the people to be secure in their . . . effects, against unreasonable searches and seizures," U.S. Const. amend. IV, including unreasonable investigatory stops or detentions. *United States v. Jones*, 701 F.3d 1300, 1312 (10th Cir. 2012) (citations omitted). However, not all encounters between police officers and citizens involve seizures within the meaning of the Fourth Amendment. *Florida v. Bostick*, 501 U.S. 429, 434 (1991). Instead,

> [t]he Supreme Court has recognized three types of police-citizen encounters: (1) consensual encounters which do not implicate the Fourth Amendment; (2) investigative detentions which are Fourth Amendment seizures of limited scope and duration and must be supported by a reasonable suspicion of criminal activity; and

(3) arrests, the most intrusive of Fourth Amendment seizures and reasonable only if supported by probable cause.

*United States v. White*, 584 F.3d 935, 944 (10th Cir. 2009) (citations and internal quotations omitted). The Supreme Court has further explained that a seizure occurs "[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen." *Bostick*, 501 U.S. at 434.

Notably, police officers do not implicate the Fourth Amendment by posing questions, asking for identification, or requesting consent to search, even when they have no particular reason to suspect that an individual has violated the law. *United States v. Easley*, 911 F.3d 1074, 1079 (10th Cir. 2018) (citing *United States v. Drayton*, 536 U.S. 194, 200–01 (2002)). However, a seizure does occur where a reasonable person would not feel free to terminate the encounter. *Drayton*, 536 U.S. at 201; *see also United States v. Hernandez*, 847 F.3d 1257, 1266 (10th Cir. 2017) ("[A]n individual is 'seized' when he has an objective reason to believe that he is not free to terminate his conversation with the officer and proceed on his way.") (citing *United States v. Patten*, 183 F.3d 1190, 1194 (10th Cir. 1999)). Courts assess whether a person would feel free to terminate an encounter from the perspective of the objective, reasonable person and by evaluating the totality of the circumstances. *Easley*, 911 F.3d at 1079 (citations omitted).

In *Florida v. Bostick,* the Supreme Court recognized the following non-exhaustive factors as relevant in assessing whether a reasonable person would feel free to terminate a police encounter: (1) whether the agent advised the individual that he had the right to refuse consent, (2) whether the agent in any way threatened the individual (*i.e.,* the display of a weapon and/or the nature of the questioning), and (3) the particular location of the encounter. 501 U.S. at 437. In addition to the factors set forth in *Bostick*, the Tenth Circuit has also articulated its own list of non-exhaustive factors for consideration in determining whether a seizure has occurred:

17

> (1) the threatening presence of several officers; (2) the brandishing of a weapon by
> an officer; (3) physical touching by an officer; (4) aggressive language or tone of
> voice by an officer indicating compliance is compulsory; (5) prolonged retention
> of an individual's personal effects; (6) a request to accompany an officer to the
> police station; (7) interaction in a small, enclosed, or non-public place; and (8)
> absence of other members of the public.

*Jones*, 701 F.3d 1300, 1313 (10th Cir. 2012) (citing *United States v. Rogers*, 556 F.3d 1130, 1137–38 (10th Cir. 2009)). Courts may also consider whether an officer indicated that the person was free to leave. *Jones*, 701 F.3d at 1313. "[N]o single factor is dispositive." *Id.* Additionally, these factors are not exhaustive, and the Court may consider other relevant factors. *Hernandez*, 847 F.3d at 1264. Because the seizure analysis is an objective one, subjective characteristics—such as how the accused's race might shape his reaction to police—are not permissible considerations. *Easley*, 911 F.3d at 1082.

In *Bailey v. United States,* 568 U.S. 186 (2013), the Supreme Court held that officers executing a search warrant may detain the occupants of the premises, so long as they are in the immediate vicinity of the premises to be searched. "If officers elect to defer the detention until the suspect or departing occupant leaves the immediate vicinity, the lawfulness of detention is controlled by other standards, including . . . an arrest based on probable cause." *Id.* at 202.

"[A] warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed." *United States v. Turner,* 553 F.3d 1337, 1344 (10th Cir. 2000) (quoting *Devenpeck v. Alford,* 543 U.S. 146, 152 (2004)). Probable cause exists only when "facts and circumstances within the officers' knowledge, and of which they have reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." *United States v. Valenzuela,* 365 F.3d 892, 896–97 (10th Cir. 2004) (quoting *United States v. Edwards,* 242 F.3d 928, 934 (10th Cir. 2001)). Although "[p]robable cause does not

require facts sufficient for a finding of guilt . . ., it does require more than mere suspicion." *United States v. Morris,* 247 F.3d 1080, 1088 (10th Cir. 2001).

### B. Discussion

As noted above, the defense argues that Mr. Diaz was illegally seized. The government denies that any seizure occurred and, in the alternative, that agents had probable cause to arrest and therefore detain Mr. Diaz. Although the defense primarily relies on *Bailey* and argues that the traffic stop went beyond the authority of the officers to detain individuals in the vicinity of the target premises of the search warrant, the government has conceded that officers were not relying on their authority to detain under *Bailey.* Accordingly, the Court is left to determine 1) whether Mr. Diaz was seized, and 2) whether that seizure was supported by probable cause. Ultimately, the Court finds that Mr. Diaz was seized, but that agents had probable cause. [4]

Arguably, some facts do weigh against a finding that Mr. Diaz was seized. For instance, the agents generally used a polite tone and Mr. Diaz was not handcuffed during the encounter. *Jones*, 701 F.3d at 1313. However, the remaining factors necessitate a finding that Mr. Diaz would not have reasonably felt free to leave. First, the threatening presence of several officers weighs in favor of finding that Mr. Diaz was seized. Mr. Diaz was pulled over by Deputy Whyte and three Region III Task Force agents who were wearing face coverings and bullet proof vests. Exh. 3 at 00:10–00:15. The agents who approached the car on either side were wearing face and neck

---

[4] Although the Court has found that the agents' conduct was not coercive in the context of assessing the voluntariness of Mr. Diaz's statements, this does not preclude the Court from finding that Mr. Diaz was seized. The coercion analysis regarding the involuntariness of statements asks whether officers acted in a manner that essentially *extorted* the defendant's confession. *See McCall v. Dutton,* 863 F.2d 454, 459 (6th Cir. 1988). On the other hand, the seizure analysis asks whether a reasonable person would have felt free to leave. *Drayton*, 536 U.S. at 201. It is entirely possible that police officers may act in such a way that would cause a reasonable person to not feel free to leave the encounter, but that at the same time, the conduct may not rise to the level of coercive conduct required to find that a statement was involuntary.

coverings such that only the portion of their face above the nose was visible. *Id.* Furthermore, unlike in *Jones,* where the officer who approached the defendant immediately identified himself and asked for the defendant's identification, here one of the agents immediately opened the car door without having Mr. Diaz first agree to talk to him or step out of the car. 701 F.3d at 1305. When Mr. Diaz asked why he was being pulled over, the agent just said "Well, we'll explain." Exh. 4 at 00:20–26.  As Mr. Diaz stepped out, the agent next to the driver's side door placed his hand over the gun holster on his hip. *Id.* at 00:28. When Mr. Diaz went around to the back of his car, Deputy Whyte and the three Region III agents stood around him. *Id.* at 00:50, 1:25. A reasonable person would not feel free to leave if a police officer summarily opened their car door, asked them to get out of the car, did not initially explain why they were there, and then stood around the individual with three other armed police officers. *Easley*, 911 F.3d at 1079; *see also United States v. Lowe,* 791 F.3d 424, 432 (3d Cir. 2015) (the fact that four uniformed police officers approached the defendant, along with other factors, weighed in favor of finding that defendant was seized); *Hooks v. United States,* 208 A.3d 741, 746 (D.C. 2019) (finding that defendant was seized where four uniformed police officers approached the defendant and asked him to "get up" with no explanation).

Second, courts may consider whether a defendant was informed that they were free to terminate an encounter with police officers. *Jones,* 701 F.3d at 1313. While Deputy Whyte testified that Mr. Diaz was informed he had the "option" to accompany the agents back to his house, Hr'g Tr. I at 17:3–5, the actual audio from his body camera is unclear. *See* Exh. 3 at 00:55–1:05. It is, however, undisputed that Mr. Diaz asked if he could take his daughter to school and that the agent responded, "Why don't you let one of us do that," while pointing Mr. Diaz in the direction of the police car. *Id.* at 1:10–1:13. Although the agents did not expressly tell Mr. Diaz that he could not

take his daughter to school, their response implied that he was not allowed to do so and, correspondingly, that he was not free to leave. *See State v. Stovall,* 788 A.2d 746, 753 (N.J. 2002) (finding that the police officer implied that defendant could not leave when defendant asked to leave, and officer stated, "This will just take a few moments"). Admittedly, one of the agents informed Mr. Diaz that he was not under arrest at the time. However, this fact alone is not dispositive, and it is notable that the agent's statement also implied that Mr. Diaz *could* be placed under arrest at some point during the encounter. *Cf. United States v. Adebayo,* 985 F.2d 1333, 1337 (7th Cir. 1993) (no seizure where defendant was told he was not under arrest *and* was informed he was free to leave).

Furthermore, the prolonged retention of an individual's personal effects generally weighs in favor of finding that the individual was seized. *Jones,* 701 F.3d at 1313. Thus, it is particularly telling that Mr. Diaz was asked to hand over his wallet and phone to the agents, who not only kept the items, but also drove away with them while Mr. Diaz was in the back of Deputy Whyte's car. Exh. 3 at 1:22. *See United States v. Latorre,* 893 F.3d 744, 749-751 (10th Cir. 2018) (encounter became an investigatory detention when officer kept the defendant's pilot license and registration); *United States v. Black,* 707 F.3d 531, 538 (4th Cir. 2013) (retention of defendant's identification was "highly material" and weighed in favor of finding that defendant was seized).

Lastly, a defendant is seized when their physical movements are actually restricted. *See, e.g., United States v. Young,* 707 F.3d 598, 603 (6th Cir. 2012) (seizure occurred when police car blocked the defendant from being able to leave). Thus, it is notable that Mr. Diaz was left sitting in the locked police car when he and Deputy Whyte arrived at the home. Mr. Diaz was quite literally not able to exit the police car on his own and he banged on the car doors and windows several times to try to get out. Although a defendant's subjective experience does not determine

whether a seizure has occurred, the Court notes that when Agent Lemmon finally did open the door, Mr. Diaz asked "Can I get out?" indicating that it was unclear whether he was free to leave at any point. *See* Exh. 5.

In sum, a reasonable person would not have felt free to leave where several masked and armed officers approached their car, asked the individual to get out with no explanation, did not make it clear that the individual was free to leave, and retained the individual's wallet and phone, and left him in a locked police car from which he could not exit. Accordingly, the Court finds that Mr. Diaz was seized when he was brought back to his home in Deputy Whyte's car.[5]

Having found that Mr. Diaz was seized, the Court next turns to whether the seizure was supported by probable cause. Here, the defense argues that the agents did not have probable cause to detain Mr. Diaz because in conducting the four controlled buys, the agents relied on information from a confidential source, whose reliability and veracity were unconfirmed. Doc. 16 at 7–8. The defense's arguments are unavailing.

It is true that in conducting the four controlled buys, Agent Jones was relying in part on the informant to verify that it was in fact Mr. Diaz who sold cocaine. On cross-examination, Agent Jones admitted that he had not directly observed any of the controlled buys. H'rg Tr. II at 3:21. Furthermore, although Agent Jones testified that in at least one of the recordings he heard the confidential source purchasing the drugs from Mr. Diaz, Hr'g Tr. II at 4:4, he conceded on cross-examination that he had never heard Mr. Diaz's voice prior to listening to the recording. Hr'g Tr. II at 4:7–9. However, the reliability of an informant can be corroborated where the police search

---

[5] Although Deputy Whyte, Agent Jones, and Agent Lemmon all repeatedly testified that Mr. Diaz went back to the house "of his free will," police officers' legal conclusion that a suspect or defendant has agreed to continue an encounter voluntarily is not relevant to the factual determination required under the objective standard set out in *Jones*.

the informant and their vehicle for money and contraband prior to the buy, give the informant money with which to purchase the narcotics, follow the informant to the residence, watch the informant as they enter the residence, search the informant upon exiting the suspect residence, and then receive the illegal narcotics from the informant. *United States v. Artez,* 389 F.3d 1106, 1112 (10th Cir. 2004). Additionally, "the absence of constant visual contact with the informant conducting the transaction does not render a controlled purchase insufficient, nor does the absence of an audio-recording of the transaction." *Id.*

The agents in the instant case followed the above procedures for the four controlled purchases, with a few variations. Admittedly, the agents followed the informant only to Josephine Road and did not see the informant enter Mr. Diaz's home, as they did not want to risk being detected. However, for the last two controlled purchases, agents placed a tracking device on the source's car to track the car's location and confirmed that the car entered Mr. Diaz's property. Hr'g Tr. I at 64:19–25, 66:11–12. Thus, even if the first two purchases were not sufficient to support a finding of probable cause, the latter two purchases corroborated the informant's veracity through GPS tracking of the informant's vehicle. Accordingly, at least two of the controlled buys gave agents probable cause to stop Mr. Diaz. *See also United States v. Hinson,* 585 F.3d 1328, 1334–35 (10th Cir. 2009) (officers had probable cause to arrest after arranging one controlled purchase of methamphetamine).

Based on this information, Agent Jones authorized Deputy Whyte to stop Mr. Diaz's car. Even though, as noted above, it is not clear whether Agent Jones directly communicated this order to Deputy Whyte, the authorization ultimately came from Agent Jones and Deputy Whyte was informed that it was in fact Mr. Diaz who was driving the Lexus. The Tenth Circuit has held that "a police officer may rely on the instructions of the DEA . . . in stopping a car, even if that officer

himself or herself is not privy to all the facts amounting to probable cause." *Hinson,* 585 F.3d at 1335 (quoting *United States v. Chavez,* 534 F.3d 1338, 1347 (10th Cir. 2008)). Thus, having been authorized to stop the car by Agent Jones and informed that Mr. Diaz was the driver, Deputy Whyte had probable cause to stop the Lexus and detain Mr. Diaz. Therefore, suppression of any statements or evidence resulting from the seizure is not warranted.

## CONCLUSION

The events that took place on September 3, 2019 were undoubtedly stressful for Mr. Diaz and frightening for his young children. However, the agents did not engage in the coercive conduct necessary to render a statement involuntary. Accordingly, Mr. Diaz's statements and the evidence discovered in his home will not be suppressed. Although Mr. Diaz was seized by Deputy Whyte, the prior controlled purchases of cocaine by a confidential source were sufficient to establish probable cause. Thus, suppression of the evidence discovered after Mr. Diaz's seizure is equally unwarranted.

**IT IS THEREFORE ORDERED THAT** Mr. Diaz's Motion to Suppress Statements and Evidence for Violations of the Fourth and Fifth Amendments to the U.S. Constitution [Doc. 6] is denied.

ENTERED this 31st day of January 2024.

_____
MARTHA VÁZQUEZ
SENIOR UNITED STATES DISTRICT JUDGE